# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. ANTHONY DWIGHT COX

**Appeal from the Circuit Court for Madison County**
**No. 99-17     Franklin Murchison, Judge**

---

**No. W2000-00644-CCA-R3-CD  - Filed January 2, 2002**

---

The defendant, Anthony Dwight Cox, appeals from his convictions for aggravated rape and aggravated assault, contesting the sufficiency of the evidence.  We affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Anthony Dwight Cox.

Paul G. Summers, Attorney General & Reporter; Angele M. Gregory, Assistant Attorney General; James G. Woodall, District Attorney General; and Donald H. Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted by a Madison County Circuit Court jury of aggravated rape, a Class A felony, and aggravated  assault, a Class C felony.  The trial court sentenced him as a violent 100% offender to twenty-two years and six months in the Tennessee Department of Correction for the aggravated rape conviction.  He received a concurrent sentence of five years as a Range I, standard offender for the aggravated assault conviction.  The defendant contends that the evidence is insufficient to support his convictions.

Officer Tyrees Miller of the Jackson Police Department testified as follows: At 10:11 p.m. on October 3, 1998, he was dispatched to an area off Riverside Drive in Jackson.  He saw Preston Tharpe, Amber Caviness, and the victim standing on the side of the road.  Mr. Tharpe and Ms. Caviness were standing near the victim and appeared to be comforting her.  Officer Miller saw that the victim's eyes were beginning to swell and her lip was bleeding.  The victim was crying and appeared to be very upset.  She was naked except for some type of covering draped over her, and she appeared to have blood under her fingernails.

The victim told Officer Miller that "Peanut," whom the victim identified as the defendant, and someone the defendant referred to as "Glen" assaulted her about 9:45 p.m. She gave the officer a physical description of the two men and described the general area where Peanut lived. She told Officer Miller that Peanut was driving a silver Ford with two or four doors. Officer Miller dispatched the car's description over his police radio so that other officers could be looking for it.

An ambulance took the victim to the emergency room at a local hospital while Officer Miller stayed at the scene to look for the victim's clothes. The victim had told Officer Miller to look for her clothes behind an abandoned Coca-Cola plant, and other officers found her clothes there. The area around the Coca-Cola plant was dark with no houses nearby.

On cross-examination, Officer Miller acknowledged that the area around the Coca-Cola plant is known for prostitution. However, Officer Miller, who works the area regularly, had never seen the victim before. The victim did not appear to be intoxicated or on drugs, and Officer Miller did not ask her if she had been drinking or taking drugs. Officer Miller talked with Mr. Tharpe and Ms. Caviness and wrote the initial police report. Sergeant Randy Blankenship, the crime scene technician, photographed the crime scene, collected evidence, and took pictures of the victim's injuries.

Preston Tharpe testified as follows: On October 3, 1998, he and his fiancee, Amber Caviness, were on their way to a bowling alley and driving in the Riverside Drive area. About 10:00 p.m., they turned onto Taft Street and saw a naked woman standing in the middle of the road. Mr. Tharpe pulled over and gave the victim an old work shirt so that she could cover up. The victim was crying, and her eyes were swollen. She had blood all over her face, and her nose and mouth were "busted." Mr. Tharpe and Ms. Caviness tried to calm the victim down, but she was hysterical, and Mr. Tharpe could not understand her. He did not see any cars leaving the area. On cross-examination, he said that he could not tell if the victim was intoxicated.

Amber Caviness testified as follows: She and her boyfriend were going bowling on the night of October 3, 1998. They turned onto a road and saw the naked victim walking. Mr. Tharpe pulled over to help the victim, and the victim's face was "bad messed up." The victim's lip was swollen, and her eye was cut. Mr. Tharpe gave the victim his shirt so that she could cover up and some napkins to wipe the blood off her face. The victim was hysterical and could barely talk. When the police arrived about fifteen minutes later, Mr. Tharpe and Ms. Caviness told the police what they had seen and what the victim had said. Mr. Tharpe and Ms. Caviness left after the victim was taken away in an ambulance.

Officer Andrew Ledford of the Jackson Police Department testified as follows: He was on patrol on the night of October 3, 1998, when he received a report that a woman had been injured and assaulted. He was dispatched to an area off Riverside Drive and went to the street that runs behind the Coca-Cola plant. Officer Miller was already there, and the scene was somewhat chaotic. Officer Ledford looked in an overgrown area behind the Coca-Cola plant and found the victim's blouse, shirt, shoes, and underwear. Some of the items were in the bushes, while others were on the ground.

The victim's clothes were found in a dark and isolated area. According to Officer Ledford, Riverside Drive is a high crime area for drug sales and prostitution.

Sergeant Randall Blankenship of the Jackson Police Department testified as follows: On the night of October 3, 1998, he went to the Jackson-Madison County General Hospital and photographed the victim. The victim appeared to be in a lot of pain, and she appeared to have bite marks on her right arm and back. Her right arm also was bruised. Sergeant Blankenship photographed the victim's injuries, and the state introduced those pictures into evidence. Dr. Bill Willis and a nurse performed a sexual assault kit examination on the victim. Dr. Willis collected evidence for the kit and gave the kit to Sergeant Blankenship. Sergeant Blankenship took the kit to the police department, put it in a locker, and then sent it to the Tennessee Bureau of Investigation (TBI) crime laboratory for analysis. Sergeant Blankenship went to the crime scene and took photographs of the victim's clothes, which had not been disturbed. He then collected the clothing. Sergeant Blankenship noticed fresh blood stains on the victim's blouse. On cross-examination, Sergeant Blankenship said that Riverside Drive is a moderate crime area for prostitution. He acknowledged that the main purpose of the sexual assault kit is merely to determine whether the victim had sex.

The victim testified that she had been staying at the Diamond Motor Inn with her boyfriend, Cleotis Williams, and that he gave her a twenty-dollar bill to buy cigarettes and a lighter. She said that at 8:30 p.m., she started walking to a store and that the defendant approached in a silver four-door Ford. She said that the defendant asked her if she needed a ride and that she told him no. She said that she noticed another man in the back seat and that she told the defendant that she did not get into cars with more than one person inside. She said that the defendant got out of the car, snatched the twenty-dollar bill out of her hand, and said, "You are going to give me some p****, too, or I'm going to kill you." She said that he drug her by her hair into the front seat of the car and that he drove behind the old Coca-Cola plant.

The victim testified that after the defendant forced her into the car, Roy Elder, who was sitting in the back seat, put his arm around her neck and began choking her. She said that she could not get out of the car because the doors were locked. She said that the defendant and Mr. Elder kept saying that she needed to be killed and that Mr. Elder told her that if she turned him in to police, he would kill her. She said that after the defendant parked behind the Coca-Cola plant, he grabbed her by the hair and punched her in the nose. She said that blood was on her shirt and all over the front seat of the car. She said that the defendant busted her nose and lips, kicked her tooth out, and kicked the sides of her body. She said that both men bit her on her breasts.

The victim testified that the defendant raped her anally until he ejaculated and that Mr. Elder raped her anally but that he did not ejaculate. She said that she had never had anal sex before. She said that she was forced to perform oral sex on both men. She said that while she was being raped or performing oral sex on one man, the other man was beating her. She said that while the defendant was raping her, she fought and scratched him. She said that both men smelled of alcohol and that they "were sticking stuff up their nose[s]." She said that they kept her for two and one-half to three hours.

The victim testified that when the men were through with her, the defendant opened the car door and pushed her out. She said that as they were driving away, the defendant tried to run over her. She said that her clothes had been thrown into the woods and that she could not find them. She said that she was walking down the street nude when Mr. Tharpe and Ms. Caviness stopped to help her. She said that she told Ms. Caviness and Officer Miller what the defendant and Mr. Elder did to her and that she gave physical descriptions of the two men to Officer Miller. She said that she was in severe pain and had bruises and marks all over her body. She said that she stayed in the hospital overnight.

On cross-examination, the victim admitted that she was a prostitute. At first, she denied that the defendant was one of her clients but later admitted that she had sexual intercourse with the defendant two times before the incident in question. She said that she last had sex with the defendant about a month before the rape and that he paid her twenty dollars. The victim said that she did not remember saying at the preliminary hearing that she told the defendant she needed a ride to the store. She also said that she did not remember saying at the preliminary hearing, "Anthony didn't [have sex with me], but Roy Elder did." She said that she was on pain medication at the preliminary hearing.

The victim acknowledged on cross-examination that she used cocaine. However, she said that she had not used cocaine for four days before the trial and that she was not under the influence of drugs. She denied that she had consensual sex with the defendant on October 3, 1998, and that she threw a fit when the defendant refused to pay her. When asked if she said at the preliminary hearing, "I am not as interested in getting them for rape as I am for beating me," she acknowledged making that statement but said that she made it because she has an arrest record for prostitution and that she did not think the law would be on her side.

The state recalled Amber Caviness as a witness. Ms. Caviness testified that the victim said that she was walking to the store, when a car pulled up and two men "snatched her in." Ms. Caviness said that the victim told her that the two men raped the victim, threw the victim out of the car, and tried to run over the victim.

Dr. William Willis testified as follows: He treated the victim in the emergency room on October 3, 1998, and performed a complete physical exam on her, including pelvic and rectal exams. He also gathered evidence for a sexual assault kit and gave the kit to Sergeant Blankenship. Dr. Willis found superficial abrasions in the victim's anal area, and the anal area was very red. Based on this, Dr. Willis concluded that there could have been sexual trauma to the victim's anal area. The victim also had severe bruising to her body, including bruising around her left eye and on her upper back. The victim's abdomen was tender, and her injuries appeared fresh. The victim appeared to be in a lot of pain, and Dr. Willis prescribed anti-inflammatory and pain medications for her.

Sergeant Calvin Scott of the Jackson Police Department testified that on October 3, 1998, he received a "be-on-the-lookout" (BOLO) call for a suspect named "Peanut" and the suspect's car. He said that he found the car parked in front of a residence on Lee Street and that he determined the car belonged to the defendant. Sergeant Scott said that he talked with the defendant, who denied

knowing anyone named Peanut. Sergeant Scott said that he noticed that the defendant matched the BOLO's description and that the defendant had a scratch on his lower lip. He said that when he asked the defendant about the scratch, the defendant said he cut himself shaving. Sergeant Scott said that he thought the defendant's explanation was odd because the defendant looked like he had not shaved in a couple of days. Sergeant Scott said that he learned that the defendant had changed clothes before the police arrived. He said that he found the clothes the defendant had been wearing and that he noticed they had fresh blood stains on them. He said that he also saw fresh scratches on the defendant's back, arms, and chest. Sergeant Scott said that he arrested and photographed the defendant.

Doris Jackson, investigator with the Jackson Police Department's Violent Crime Division, testified that she met with the victim on October 5, 1998. She said that she showed the victim an array of photographs and that the victim immediately identified the defendant's picture.

Officer Jackson testified that the defendant made the following statement:

> Glen Elder and myself were riding and drinking. We saw a white female walking near Riverside that I had had sex with before. I knew her to be a hooker. We stopped the car. She got in. We drove down on Riverside and parked. We [were drunk]. Glen grabbed her, and we began to beat her up with our fists. She fought back. She took her clothes off. We made her perform oral sex on us, and I did have sex with her in the normal way, vagina, and in her butt, (anal). We were there about a half an hour. We got through and drove off without her. I dropped Glen off and I went home. That's when the police came.

Officer Jackson said that she wrote the statement for the defendant, that she read the statement back to him, and that he signed it. She said that she took the sexual assault kit to the TBI crime laboratory.

On cross-examination, Officer Jackson said that she could not remember if she asked the defendant if he could read. She said that she gave the defendant an opportunity to read his statement and that she went back over the statement with him "word for word."

Chad D. Johnson, a forensic serologist and DNA analyst for the TBI, testified as follows: Officer Jackson hand-delivered the victim's sexual assault kit and samples taken from defendant to the TBI crime laboratory. The sexual assault kit contained the victim's blood, hair, and oral and anal swabs. Agent Johnson tested the kit's oral and anal swabs for the presence of semen and sperm. Agent Johnson detected sperm on the anal swab, but the oral swab tested negative for semen and sperm. Agent Johnson compared DNA from sperm found on the anal swab to DNA in samples taken from the defendant. He determined that the sperm found on the victim's anal swab came from the defendant. On cross-examination, Agent Johnson acknowledged that his tests merely showed that the victim and the defendant had sex or physical contact.

-5-

The defendant testified that he was driving on Airways Boulevard, when he passed the victim. He said that Roy Glen Elder was passed out in the back seat. He said that the victim knew him and flagged him down. He said that he pulled over and that the victim asked if she could ride with them. He said that he told the victim that she could ride and that the victim opened the door and got into the passenger side of the car. He said that he did not drag the victim into the car by her hair.

The defendant testified that the victim told him to drive behind the Coca-Cola plant. He said that the victim agreed to have sex with him for five dollars. He said that he and the victim pulled off their own clothes and that Mr. Elder woke up before he and the victim finished having sex. He said that while he was putting his clothes on, the victim grabbed his wallet and tried to get out of the car. He said that Mr. Elder grabbed the victim's arm and that the victim "went crazy" and started fighting. The defendant said that he fought the victim and that he kicked her out of the car without paying her. He said that he had consensual sex with the victim and that he hit her a couple of times in self-defense. He said that he did not write the statement that he gave to Officer Jackson and that Officer Jackson did not read it to him before he signed it. He said that he signed the statement because he was told to sign it.

On cross-examination, the defendant testified that at the time of the crime, he worked for Michael's Painting Company. He said that the silver Ford belonged to his mother-in-law but that he was driving it on the night of October 3, 1998. He said that he and Mr. Elder had been drinking beer at the Red Dog Saloon and that he drank a six-pack. He said that he and Mr. Elder left the Red Dog Saloon in the silver Ford and that he went to look for a prostitute. He said that he and Mr. Elder had known each other for a few years but that they were not good friends.

The defendant testified that the victim was walking away from the Diamond Motor Inn and that the victim got into his car knowing that the defendant wanted sex. He said that he and the victim had sexual intercourse in the front seat and that Mr. Elder never had sex with the victim. He said that he also had anal and oral sex with the victim. He said that when the victim grabbed his wallet, she had her clothes in her hand and that she was going to jump out of the car naked. The defendant said that he threw the victim's clothes out of the car but that he did not try to run over the victim.

The defendant testified that he had sex with the victim about a month before this incident and that he paid her seven dollars. The defendant said that he had had vaginal and anal sex with the victim before this incident. The defendant said that he can read "some words." He said that Officer Jackson got the facts mixed up and that he never told Officer Jackson that he forced the victim to have oral or vaginal sex with him. The defendant said that he did not think that the victim scratched his face and that he did not remember telling Officer Scott that he cut himself shaving. He acknowledged that he has a prior conviction for aggravated burglary and that he did not tell Officer Jackson that the victim grabbed his wallet.

The victim was recalled by the defense. She said that Mr. Elder raped her but that he could not ejaculate. When asked by the defense if she said at the preliminary hearing that both the

defendant and Mr. Elder ejaculated, she testified that she did not remember making that statement.

The state recalled Officer Doris Jackson as a rebuttal witness. She testified that the defendant never indicated to her that he could not read or that he did not understand the questions she was asking him. She said that the defendant was very remorseful for what he did and that he told the police that the other man with him in the car was Mr. Elder.

The defendant contends that the evidence is insufficient to support his aggravated rape and aggravated assault convictions. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In order to prove the essential elements of aggravated rape as alleged in the indictment, the state had to prove beyond a reasonable doubt that the defendant unlawfully sexually penetrated the victim and caused bodily injury. See Tenn. Code Ann. § 39-13-502(a)(2). Bodily injury is defined as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). A person is guilty of aggravated assault when he causes "serious bodily injury" in the assault of another. Tenn. Code Ann. § 39-13-102(a)(1)(A). Serious bodily injury is defined as a bodily injury involving any of the following:

(A) a substantial risk of death;

(B) protracted unconsciousness;

(C) extreme physical pain;

(D) protracted or obvious disfigurement; or

(E) protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.

Tenn. Code Ann. § 39-11-106(33).

Viewed in the light most favorable to the state, the evidence shows that the defendant was guilty of aggravated rape and aggravated assault. The victim testified that the defendant forced her

to have anal sex by penetrating her anally. She also testified that he forced her to perform oral sex on him. In a statement that the defendant gave to police two days after the incident, the defendant acknowledged that he forced the victim to have vaginal and anal sex and that he made her perform oral sex on him. Moreover, Dr. Willis testified that the victim's anal area had abrasions and inflammation consistent with sexual trauma. In addition, the defendant's sperm was found on an anal swab taken from the victim.

As to the defendant's aggravated assault conviction, the victim testified that the defendant beat her and kicked out a tooth. The defendant acknowledged that he hit the victim at least a couple of times because the victim "went crazy." In his statement to the police, the defendant said that he and Mr. Elder beat the victim with their fists. Photographs of the victim's injuries show that the victim suffered serious bodily injury as a result of the defendant's beating. In the photographs, the victim's left eye and lips are swollen, her nose is bloody, she is missing a tooth, and she has bruises on her arms and abdomen. The lost tooth, alone, supports a finding of obvious disfigurement. See State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). The photographs also show bite marks on the victim's breasts. Furthermore, several witnesses testified that the victim's mouth and lips were busted, her eyes were swollen, and she had blood on her face and clothes. The victim said that the defendant kicked her in the sides of her body and that she was in a lot of pain. She was still taking pain medication two days after the attack. Although the defendant argued that he and the victim had consensual sex and that he hit the victim in self defense, the jury chose to believe the testimony of the state's witnesses over that of the defendant, and that is its prerogative. We hold that the evidence is sufficient to support the convictions.

Based on the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE